# CHARLESTON.

KEYSER CANNING COMPANY *v.* KLOTS THROWING COMPANY.

Submitted May 1, 1923.    Decided June 26, 1923.

1. NEGLIGENCE—*Ordinary Care Required.*

Every person in the conduct of his own affairs is bound to act with the care expected of a man of ordinary prudence;

94 W. Va.

if damage results to a neighbor from his failure to so act, he is liable therefor. (p. 359).

2. SAME—*Injury by Fire Caused by Spontaneous Combustion Actionable.*

Where a canning company occupies under lease a portion of the floor space of a building for use in its canning business and a silk throwing company occupies under lease from the same landlord the remaining floor space for use in its business of drying and manufacturing silk, and in the conduct of its business, the silk throwing company so negligently constructs, maintains and operates a drying-kiln upon its proportion of the premises that in consequence of the spontaneous combustion of the kiln and its contents the building and cannery are destroyed by fire, an action lies therefor against the silk throwing company. (p. 359).

3. SAME—*Not Presumed From Mere Proof of Injury.*

Generally, where plaintiff's right of action for injury is based upon defendant's alleged negligence, negligence will not be presumed from mere proof of the injury, but plaintiff must prove the negligence as alleged. (p. 359).

4. APPEAL AND ERROR—*Verdict Clearly Against Weight and Preponderance of Evidence Set Aside.*

While the verdict of a jury in actions for negligence is entitled to great respect, yet if it is clearly against the decided weight and preponderance of the evidence, it will be set aside. (p. 357).

5. NEGLIGENCE—*Precautions Against Injury by Fire Required.*

The law requires the occupant of premises to exercise reasonable care to protect his buildings from fire and to prevent the spread of fire therefrom to the premises of his neighbor; and the presence of a mischievious or disobedient human being upon the occupant's premises, who the occupant knows may likely cause a fire which may be communicated to his neighbor's property, may constitute a danger against which the law requires the occupant to guard his neighbor. (p. 362).

6. MASTER AND SERVANT—*Employer Held Liable for Loss by Fire Caused by Employee Smoking.*

A silk manufacturing company conducted its business in a wooden building, amid highly inflammable surroundings; it had in its employ a young man known to be a smoker of cigarettes, knew of the dangers of fire from that source and repeatedly warned him against smoking upon its premises; the company permitted him after his hours of service were

ended to sleep of nights in the premises, notwithstanding the
fact that it had full knowledge that he was continuing his
habit of smoking and was disobedient to instructions, but
took no further steps to prevent it; a fire was caused by the
employee negligently throwing a lighted cigaratte stub into
a waste-basket on defendant's premises, and it spread to and
destroyed his neighbor's property. The silk manufacturing
company is liable to its neighbor for its loss, though the
employee was not actually performing service for it at the
time of his negligent act and in furtherance of its busíness.
(p. 362).

Error to Circuit Court, Mineral County.

Action by the Keyser Canning Company against the Klotts
Throwing Company. Judgment for defendant, and plaintiff
brings error.

*Reversed and Remanded.*

*Harry G. Fisher* for plaintiff in error.

*H. P. Whitworth* and *Chas. N. Finnell* for defendant in
error.

MEREDITH, JUDGE:

This is an action of trespass on the case to recover dam-
ages for the burning of a building, including certain ma-
chinery and merchandise therein; the fire is alleged to have
been caused by the negligence of defendant. The trial court
entered judgment for defendant on the verdict of the jury and
plaintiff obtained a writ of error.

A statement of the situation is necessary in order to enter
upon an intelligent discussion of the assignments of error.
Charles W. Siever owned a parcel of land in Keyser, con-
sisting of six lots, each having a frontage of twenty-five feet
on Mozelle street, and extending from that street 120 feet
back to the Baltimore & Ohio Railroad, so that the parcel was
150 feet in width and 120 feet in depth. Practically all of
the parcel was covered by a large frame building, except the
eastern side; that portion was vacant. The main part of the
building was three stories high. Around this on three sides
were grouped various one and two story rooms, used in con-

nection with the main building. For purposes of description, we will treat the building as fronting on the railroad. Immediately in front of the three story portion was a one story room in which was housed an 80 H. P. engine. To the right along the railroad was a two story room, called the "East Wing"; to the left was another one story room in which were a pump, an 80 H. P. boiler and a 30 H. P. boiler. A one story scalding shed was on the side next to Mozelle street; about midway but to the left or western side of the main or three story portion was a one story room, called the "storage shed"; in front of and and adjoining the storage shed was a two story room, called the "Knitting Mill." All these different rooms were used in connection with the main building; parts of the structure were used by plaintiff in its business of canning fruits and vegetables in season, and at the time of the fire, were being used chiefly to can tomatoes; the remainder of the building was used by defendant in preparing and throwing silk, and generally operating a silk mill. Approximately half the floor space was used by each, but defendant occupied all the second and third floors and parts of the first.

In November, 1911, Siever, the owner of the building, leased the entire premises to the plaintiff, including certain line shafts, pulleys, an engine and heating pipes. Before that the building had been used as a woolen mill. Plaintiff had the right to continue its lease for five years from January 1, 1912. On May 10, 1914, plaintiff leased to defendant the second and third stories, including the second story of the "East Wing"; also the engines and boilers, the rooms on the first floor where they were located and a room adjoining on the south and east. Defendant agreed to furnish plaintiff engine power for its use in the canning business, but not to exceed three horse power more than it used during the 1913 season, and also water for its purposes; plaintiff was to pay one-half the cost, for the period the power and water were furnished, for the fuel, oil and engineer's salary. It was to do certain work on the boilers not necessary to mention here, and thereafter defendant was to keep them in re-

pair and insured. Defendant could make alterations, not involving structural changes, which it might desire in connection with its business. This lease arrangement continued until May 10, 1918, when it was agreed that defendant should pay its rent direct to Chas. W. Siever, but no other change seems to have been made in the arrangements between plaintiff and the defendant.

Defendant installed its silk mill, its main machinery being located on the second floor of the main or three story structure; on the second floor of the "East Wing" it placed its "drying kiln"; this room was 22 by 33 feet, lengthwise facing the railroad; the kiln was located in the east and outside corner of the room, next the railroad; there was a door leading from this room to the second floor room of the three-story portion; a stair-way extended from the front of the ground floor room up to the second floor, landing near the entrance door between the drying room and the second story main floor room. The controversy largely revolves around the structure and operation of the kiln. It consisted of a box like arrangement, approximately four feet wide, six feet long and six feet high. The sides and top were made of hard maple; the floor which was of yellow pine was punctured with auger holes. Underneath this floor, suspended to the joists, was a series of steam-pipes, a sort of radiator, arranged in tiers or coils, with a total length of about 500 feet; they were enclosed on the bottom and sides with a wooden box, which was lined on the inside with asbestos; at the front and outside the box was an eighteen inch fan, which was operated by machinery to drive air through the box, and force the heat from the pipes up through the holes in the floor of the kiln. At the top of the kiln was an opening or openings to let the vapors escape. There was also a large sheet iron pipe, something like a stove pipe, extending from the top of the kiln through the outside wall; this was equipped with an ordinary damper. The steam used in the coils was generated from the boilers located on the ground floor. The silk, after being treated to a solution of water, soap, soda and neats-foot oil, was hung on racks and wheeled into the kiln, the door

thereto was closed, and it remained there about three hours to be heated and dried.

The boilers and engine were under defendant's ·control. It furnished heat and power to plaintiff, at the same time furnishing heat and power for the operation of its own silk mill. The kiln had been in operation for over five years. The heated steampipes, which we will for brevity call 'the radiator, had during that time caused the wooden floor and sides of the kiln to. char and turn a brownish color; the pine floor had been renewed a number of times, but no changes had been made in the kiln walls. The parts next to the radiator had' become punky and brittle, through a process of slow combustion, and the weight of the kiln and contents seems to have caused the floor to sag so that it had to be propped up from below. Defendant had been often requested to replace the kiln with one of non-combustible materials. There was evidence to the effect that the asbestos lining to the box which partly encased the radiator had broken and fallen away from its sides. In February, 1918, after an inspection of the premises and particularly of the kiln, by the inspectors employed ·by the insurance company that had policies on plaintiff's cannery, plaintiff's insurance was cancelled, because of the dangerous condition of the kiln and defendant was then warned of the danger. But, its superintendent, after communicating with the officers of the company, said they were having no trouble with defendant's insurance, and defendant decided to take chances. It gave no further heed. On Saturday noon, September 7, 1918, it quit work for that week, but it did not shut off the steam, as that was needed for plaintiff's cannery; nor did it shut off the steam running into the kiln, although if defendant's testimony is to be believed, the kiln was not in use. It had in its employ a young man, 20 years old, named Edward Thorpe, who on this day was acting as defendant's engineer. His duties, as testified to by him, were to keep steam up, the machinery going, and keep charge of things in general. He kept steam up till 10 o'clock on this Saturday night. By permission of defendant's superintendent, he slept in the room where the kiln was lo-

cated, while his home-folks were away; had slept there for several nights preceding. His home was in Keyser. He testified that some glass had been left on top of the kiln, and about two o'clock Sunday morning, while he was dozing in his chair, he heard a crackling sound as of breaking glass, looked up and saw smoke coming out of the top of the kiln. He is the only eye-witness who claims to have seen the beginning of the fire. He opened the kiln door, rushed to a fire extinguisher, threw the contents on the fire; got two more from the mill, threw their contents on the fire; broke out a window for escape, then called the telephone office to give the alarm. It was perhaps five minutes before he got any response from the telephone. He escaped by the stairway heretofore mentioned. The building and all its contents were destroyed, except a small amount of salvage.

After the fire, Chas. W. Siever assigned to the plaintiff his claim for damages to his building and his machinery, so plaintiff sues to recover two claims: (1) the damages occasioned to the property held by it in its own right, and (2) the damages caused to the property of its assignor.

It bases its case on defendant's alleged negligence as follows:

1. (a) Negligently constructing, maintaining and operating an improperly constructed wooden dry-kiln, in which the wooden parts were permitted to be constantly exposed to heat and become dangerously inflammable; (b) Negligently permitting the box under the kiln in which was located the coil of pipes to become out of repair and to become charred from the constant application of heat; the asbestos lining to fall away from the sides and the wooden sides exposed; the box to fill up with dust, shavings and debris and to become liable to ignite and become afire from spontaneous combustion; (c) Negligently failing to shut off the steam from the coil of pipes and kiln from Saturday noon, September 7th to 10 P. M. of that day, since the kiln was not then in use; (d) that defendant dried in its kiln silk, cotton and other fabrics, which prior thereto had been treated with oil and other inflammable substances, and while the kiln was

filled with these fabrics, and the kiln was out of repair, defendant negligently forced into the kiln excessive heat, and caused the kiln and its contents to ignite by spontaneous combustion.

2. Other alleged acts of negligence were that defendant violated its duty to shut off the steam going into the coil of pipes and failed to give proper ventilation to the kiln; also in negligently failing to equip the kiln with a thermometer so as at all times to determine the proper temperature therein and in failing to equip the pipe carrying steam to the radiator with a proper valve so the amount of steam could be controlled, and in failing to equip the kiln with an automatic device that would at all times prevent excessive heat going into the kiln.

3. A final ground of negligence is alleged in the third count in plaintiff's declaration to the effect that defendant knowingly hired and kept in its employ, incompetent persons, who were permitted to sleep and spend the night in its factory, and knowingly allowed them to smoke therein, and that these employees negligently threw the unused portions of lighted cigars, cigarettes and the contents of pipes upon the floors and property of defendant, which set fire to defendant's property and which fire spread to the property of plaintiff and of plaintiff's assignor, thereby destroying it.

Defendant pleaded not guilty. Plaintiff upon the trial relied and still relies upon its showing of spontaneous combustion of the kiln and its contents for the origin of the fire; defendant claimed and still claims that there was no duty resting upon it to find the cause; that plaintiff must point out the exact origin of the fire and show that defendant's negligence was the cause. It did not attempt to show the origin of the fire, except in the examination of its night-watchman, who testified that on making his rounds into the drying room, about one o'clock Sunday morning he found young Thorpe smoking cigarettes and remonstrated with him about it; that when he returned about two o'clock he met Thorpe about the head of the stairs, hollowing "fire", went on in the drying room and found the contents of a waste paper basket near

a desk, and some silks nearby in flames, and that these were some distance away from the kiln, and there was no fire in the kiln, thus leaving the impression that the fire was caused, not by any defect in the kiln, but from Thorpe's negligence in throwing lighted cigarette stubs into the waste-paper basket.

There were over sixty instructions offered by plaintiff, and twenty-one offered by defendant. About half of these were given, many of them covering the same points of law in different phraseology. It seems useless for this court to inveigh against the practice of counsel in needlessly offering so many instructions, which only tend to confuse the jury, embarrass the court and entail endless labor for nothing. We will ignore all points raised in the case except those which we deem controlling.

The court, at plaintiff's request, instructed the jury that if they found that through defendant's negligence the property took fire from spontaneous combustion, then they should find for plaintiff. Plaintiff's case was tried upon the theory that the fire originated in that way, but it also contends that if the fire was started through the negligence of Thorpe, defendant is likewise liable. Defendant did not attempt to account for the fire, except by merest inference that it was started by a lighted cigarette thrown in the waste basket by Thorpe, and it obtained an instruction to the effect that unless plaintiff had pointed out the exact origin of the fire and that this was caused by defendant's negligence, then plaintiff could not recover; and another, to the effect that it had not been shown in evidence that Thorpe was engaged in defendant's service while he was present in its office just prior to the fire and that defendant could not be held responsible for any act of Thorpe at that time, which in the opinion of the jury caused the fire. These instructions eliminated from the consideration of the jury any negligence of Thorpe and bound plaintiff to prove that the fire originated through spontaneous combustion. On that question the jury found for defendant; so that, boiled down, the main questions here are:

1. Whether the verdict is contrary to the law and the evidence.

2. Questions arising upon certain instructions.

3. Some minor questions involving rulings upon the admission or rejection of evidence.

Plaintiff insists that the fire originated by spontaneous combustion of the dry kiln and its contents. We think the construction, maintenance and operation of the kiln clearly proved; nor is there any doubt that it was clearly and decisively shown that the kiln, including the walls and floor and the sides of the box encasing the radiator had been allowed to become deteriorated and charred by the constant application of heat and to become exceedingly dangerous and liable to take fire from spontaneous combustion. It is well known that spontaneous combustion is sometimes the cause of fires.

"When large quantities of soot, linen, paper, cotton or woolen stuffs, ship's cables, etc., become soaked with relatively small amounts of oils (especially drying oils) and exposed to a limited access of air, they may take fire sooner or later. The presence of moisture frequently aids spontaneous combustion, and piles of damp hay, freshly mown grass, sometimes take fire spontaneously. The phenomenon is not, however, without a clearly defined cause. Fats and oils can undergo a slow process of combustion at but slightly elevated temperatures. Combustion of a small amount of oil causes the evolution of a corresponding amount of heat; rise of temperature accelerates the combustion, producing a further degree of heat, until at a given moment the temperature may become so high as to cause the mass to burst into flames." 21 New Int. Ency. page 413.

It is well known that bituminous coal, when piled in heaps, frequently ignites by the decomposition of the sulphuret of iron in it. While juries may be slow to believe that fires originate that way, and the untrained mind will usually try to find some other origin, yet the fact that fires are caused by spontaneous combustion has been so well established that there can now be no doubt about it. Scientific investigation

and experiment have proved it, and the courts have unhesitatingly fixed liabilities based thereon.    In the instant case it was shown that all necessary elements were present,—the charred or slowly burned wood, not charred black, such as we usually have in mind when we speak of charred wood, but wood turned to a brownish color, through heat from steam-pipes constantly applied for a long time; some witnesses say that parts of a sill or joist were so brittle as to pulverize between the fingers; the wooden kiln impregnated with oil from the constant drying of oiled silk fabrics; there is some evidence that there was a rack laden with these fabrics in the kiln; dust and shavings in the wooden box encasing the radiator; the steam shut off at 10 P. M. and the cooling fan stopped, so that there was only a limited supply of air, the door to the kiln being closed.    Experts who had had long experience and training as chemists testified, when told of the conditions shown, that in their opinion, the fire originated in spontaneous combustion.    Among these were Dr. Frank E. Clarke, professor of chemistry in the State University; H. L. Siever, a graduate of a textile school of New Bedford, Mass., and an experienced chemist; C. C. Houch, a college graduate in and teacher of chemistry in the Potomac State School at Keyser; and J. C. Sanders, superintendent of schools, who took the course in chemistry at the State University, and has had considerable experience in chemical work. All these testified that in their opinion the fire was caused by spontaneous combustion.    Then there is the evidence of Thorpe who testified that he was awakened by a noise like cracking glass; that he looked up and saw smoke coming out of the top of the kiln; that there was some glass left on top of the kiln, and this is not disputed; that he ran to the kiln, opened the door, hastily got the fire extinguisher and threw its contents on the fire, which caused it to die down a little; he then secured two other fire extinguishers from the mill and threw their contents on without putting it out.    He broke open a window to afford a means of escape, and then called the telephone operator to sound the alarm.    He says it took about five minutes to get an answer from the telephone oper-

ator. In this he is fully corroborated by her, as she thought he was wanting to talk to her on private matters and she did not want to talk. The alarm given, he rushed down the stairway, he says, hollowing "fire"; that he met the night-watchman on the stairs, about three steps from the bottom; he went outside, with Ashby Layton and E. G. Richmond, who had been for sometime sitting in the boiler room, and the night-watchman; in his statement that the night-watchman followed him outside instead of going up the stairs into the dry-room, he is corroborated by Layton and Richmond. To off-set the testimony of Thorpe, there is the testimony of the night-watchman, who testified that he was eighty years old; that he was night-watchman at the mill; that about ten minues before two on Sunday morning he started "to wind", that is, to go his rounds; that after he had gone through the canning factory, and started to wind above, and got about two-thirds of the way up the stairs, the boy came to the top of the stairs and told him "not to come up there as the whole place was on fire;" that he thought the boy was playing pranks on him, so he went on up and into the dry-room; that the boy ran on down where the other two men were; that he, the night-watchman, tried to get a side door open, and close the mill door so as to confine the fire to the dry-room till the fire company could get there; that when he got upstairs, the fire was confined to a waste basket beside a desk, near the telephone, and some silk bars, probably six in all; these, he says, were some distance away from the kiln and in another end of the room; that the fire was about two feet high, but there was then no fire about the kiln; that he busied himself for twenty minutes trying to arrange the doors, and finally escaped to the ground outside, not by the stairway, but by sliding down a rope. He agrees that the boy had broken out a window; why he did not throw the burning basket and silk out he does not say. The only eye-witnesses who pretend to have seen the fire in its early stages were the boy and the old night-watchman. The boy's testimony is corroborated by Layton, Richmond and the telephone operator; the testimony of the night-watchman is denied in

toto by the boy, Richmond and Layton. His testimony stands alone; he is a very old man, and his story has earmarks that tend to show it is largely the product of his imagination. He repeatedly says he was in the dry-room twenty minutes while the fire was on, and yet he does not say that he even attempted to put it out. He does say that he could not find any fire extinguisher. While we recognize the great respect accorded to the verdict of a jury, we have no hesitation in saying that we accept young Thorpe's testimony, rather than the night-watchman's. The great preponderance of the testimony, and all the circumstances confirm the boy's story and refute the old man's. The verdict of the jury is clearly against the great weight of the evidence. Even the night-watchman does not attempt to say that Thorpe threw burning cigarette stubs into the waste-basket, but merely leaves that for inference. Plaintiff's property was burned by a fire which originated on defendant's premises, and we think, under the evidence, the jury would have been justified in finding that it arose from spontaneous combustion. True there are some other witnesses who say that when they first saw the fire it was in the main building and they saw no fire in the dry-room; but they were not in the building and did not arrive until the flames were bursting out of the main building; that they saw no fire then in the dry room proves nothing. The door from the dry-room to the large second story room of the main building was open and the evidence shows there was a draft of air going that way, so that the flames would tend to spread quickly into that room. That the fire started in the drying room, and nowhere else, is fully established by the testimony of a great number of witnesses. No witness having any knowledge of the fire in its early stages testified to the contrary. Even defendant's witness, the night-watchman, says it started there.

Was defendant's negligence shown? Yes, undoubtedly: It was shown that the kiln was built of wood, as heretofore stated; that it had been used for over five years in drying oiled fabrics, so that the floor and walls became impregnated with oil; the wooden parts, including a sill or joist in the box

below became charred and dangerously inflammable, so much
so that plaintiff's insurance was cancelled on an inspection
of the kiln by the engineers of the insurance company; of
this the defendant had warning, but gave no heed, probably
because no complaint was made about its own insurance. If
its own insurance had been cancelled, the defect would doubt-
less have been remedied. It was further shown that an auto-
matic device could readily have been installed that would
have controlled the steam going into the radiator; that the
steam could have been and should have been shut off from
the radiator while the kiln was not in use, but was not until
Saturday night at 10 o'clock. A sprinkler system could have
been installed which would have automatically put out the
fire, starting either from the kiln or the waste-basket. A
water tank was installed on the building; the city water sys-
tem was right at the door; we would not knowingly do de-
fendant an injustice, but we can not but believe that defendant
depended for its own safety on its fire insurance rather than
on its own precautions. The kiln could have been constructed
of non-inflammable materials; or if made of wood, it could
have been kept lined with non-combustible materials and
maintained in such manner that it would not take fire from
spontaneous combustion. Defendant says the kiln was not
in use from Saturday noon, yet Thorpe was not instructed
to shut off the steam from it and consequently he did not
shut it off until the steam plant was shut down, ten hours
later. Defendant well knew the condition of the kiln. It
had been warned. It could have prevented the fire by the
use of ordinary care, and at very slight expense. Of course,
it is easier to see now what it ought to have done, than it was
before the fire occurred, but it was its duty to guard against
danger from fire. It owned this duty to the plaintiff. If
the night-watchman is to be believed, there were no appliances
at hand, with which to put out the fire,—an act of negligence.
Had there been such he could have put it out. *McNally* v.
*Colwell*, 91 Mich, 527, 30 A. S. R. 494, and notes. We are
of opinion that defendant's negligence in constructing, main-
taining and operating such a highly dangerous fire-trap, un-

der the circumstances shown, and particularly in operating it after repeated warnings, clearly appears from the evidence. Under these circumstances, a verdict exonerating it from liability ought not to stand. In the case of *Vaughan* v. *Menlove*, 3 Bing. N. C. 468, 18 Eng. Rul. Cas. 715, defendant piled a hay-rick near the line between his and his neighbor's lands, and close to some houses. He was repeatedly warned that the hay might take fire from spontaneous combustion, but his property was insured and he said he "would chance it". It took fire spontaneously and in consequence his neighbor's houses were burned. The court held him liable on the ground that "Every person in the conduct of his own affairs is bound to act with the care to be expected of a man of ordinary prudence." We are not prepared to say, as counsel for plaintiff would have us say, that upon plaintiff's showing the origin of the fire, on defendant's premises, there is a presumption of negligence of defendant in starting it, as was held in *Moore* v. *Parker*, 91 N. C. 275, and in *Lawton* v. *Giles*, 90 N. C. 374; that rule has been applied in this state in cases of fire caused by sparks from railroad locomotives, thus casting upon the railroad the burden of showing due care. *Thompson* v. *B. & O. R. R. Co.*, 72 W. Va. 555, 78 S. E. 624; *Jacobs* v. *B. & O. R. R. Co.*, 68 W. Va. 618, 70 S. E. 369; and *Mills* v. *N. & W. Ry. Co.* 73 W. Va. 93, 79 S. E. 1090. But we know that fires occur frequently through mere accident, and it would ordinarily cast too great a burden in such instances to require defendant to show lack of negligence on his part. Generally the plaintiff must allege and prove negligence. Plaintiff's counsel says that this rule, while it might properly apply to an action for recovery for destruction of its cannery, that is, the property which was owned by it when the fire occurred, yet it ought not to apply to the building, or portion of the building then under lease to the defendant, because it was defendant's duty to return the property to its land-lord in its original condition, except for ordinary wear and tear, and that view may be correct; but in view of our holding, we do not deem it necessary to

pass on that question. See 17 Amer. Dig. (2nd. Dec. Ed.) §121, title "Negligence", and cases cited.

But let us assume that the fire was caused by the negligence of Thorpe; that he threw a lighted cigarette into the waste-basket and started it; was the court justified in giving defendant's instruction No. 8? It reads:

> "The Court instructs the jury that the witness Thorpe is not shown by the evidence in this case to have been engaged in the service of the defendant while he was present in its office just prior to the fire in question in this case and that the defendant cannot be held responsible for any act of his at that time which in the opinion of the jury, caused the fire."

It is not charged by plaintiff that Thorpe was actually engaged in service when the cigarette was supposedly thrown; but he was defendant's employee. This is admitted. It is averred that he was employed by defendant and was permitted to sleep of nights in defendant's factory and was knowingly permitted to smoke therein. Defendant shows that Thorpe smoked in the drying room, and he did this notwithstanding repeated warnings. Why was he warned? Because defendant knew of the danger. Then when it saw that Thorpe disobeyed its warnings, it was its duty to stop his smoking there, and if necesary to discharge him. We do not think that under these circumstances it can absolve itself from liability by showing that at the time he is supposed to have thrown the lighted cigarettes he was not actually in its service and that it had warned him against smoking in the building. Defendant owed a higher duty to plaintiff than to give mere warnings to Thorpe. Had it not known that he was disobeying instructions, it would have been a different situation; but according to its evidence it was well aware that he was disobedient, and yet permitted him to sleep there. The night-watchman says he was smoking at one o'clock Sunday morning and he scolded him for it. If this were so, he ought to have put him out of the building. We think the instruction should not have been given, as it absolves defendant from all liability for Thorpe's negligence, though defend-

ant permitted him to remain there knowing him to be disobedient and negligent. In *Eaton* v. *Lancaster*, 79 Me. 477, it was held that the owner of a stable is liable to the owner of a horse boarding therein, for loss of the horse by fire, where the nightwatchman who had general charge of the stable, permitted two other employees and a third party to enter the stable while intoxicated and to go up into the hayloft to sleep, and shortly thereafter they set the stable on fire. He knew they were smokers and carried pipes and matches with them. He warned them not to go up there, but rather feebly. He did not try to use any force to prevent them; the court held that if they were a dangerous element there, the jury might properly find that the nightwatchman was negligent in not preventing their going up there; and it having so found, the judgment was affirmed. Here defendant's superintendent and night-watchman knew that Thorpe smoked in the building, warned him against it, but still permitted him to continue. We think the jury might reasonably have found that this was negligence for which defendant was liable.

The rule is thus stated in 1 Thompson, Negligence, § 524:

> "It seems also that, if the master knows that his servants are guilty of a certain kind of habitual misconduct dangerous to others who lawfully frequent the master's premises, it will be his duty to exercise reasonable care to prevent such misconduct,—failing in which he will be liable to any one injured. When, therefore, the proprietor of a store knew, or might by the exercise of reasonable supervision of his business, have known that the cash boys there employed by him had been for months in the habit of snapping pins at objects and persons in the store, and neglected to prevent such misconduct, it was held that he was liable to the customer who lost an eye in consequence of a pin being snapped at her by one of his cash boys," citing: *Swinarton* v. *LeBoutillier*, 28 N. Y. Sup. 53, affirmed in 148 N. Y. 752, 43 N. E. 990.

In a well reasoned opinion the court in that case held: "The presence of a mischievous human being on premises may constitute the danger against which the law requires

of the occupant reasonable care to protect his invitee.'' In
*Tucker* v. *Illinois Central R. R. Co.*, 42 La. Ann. 114, 7 Sou.
124, it was held that ''There can be no difference in principle
whether a building has been made unsafe by the agencies
of time, weather or the acts of trespassers, which was within
the power of the owner to prevent. In any event and under
all these circumstances, it is the duty of the owner to keep
his building in a safe condition.'' There decedent was killed
by the fall of a building which had become weakened by the
gradual stealing of supports by trespassers. This was known
to defendant; it was bound to prevent it and was therefore
held liable. We see no difference in principle in the forego-
ing cases and the case at bar. Defendant was bound in this
case to use proper care to prevent Thorpe from smoking on
its premises. So under the evidence, whether the fire was
caused by spontaneous combustion due to defendant's negli-
gence or whether it was caused by the negligence of defend-
ant's superintendent or night-watchman in permitting Thorpe
to stay in the dry-room at nights, with full knowledge that
he was continuing his habit of smoking there, contrary to
their instructions, defendant might properly be held liable
for the damage wrought by the fire. A point is made that
the night-watchman was hired by plaintiff as well as defend-
ant. Plaintiff had no control over that part of the premises
leased by defendant. It could not direct and determine the
care that defendant should take of its property. It had no
control of the boy, nor can we say that the night-watchman
was acting on behalf of plaintiff while he was inspecting
defendant's property, or giving or failing to give effective
instructions to Thorpe; so plaintiff can not be held respon-
sible for the night-watchman's negligence in failing to stop
the boy's alleged misconduct. That duty devolved solely
on defendant. According to its own evidence, defendant
knowingly permitted a dangerous agency to remain upon its
premises, under circumstances which show a want of due re-
gard for its neighbor's and its landlord's rights. It necessar-
ily follows that defndant's instruction No. 8 should not
have been given; and likewise it was error for the court to

modify certain of plaintiff's instructions so as to exclude defendant's liability under the third count. These with other instructions given on behalf of plaintiff fairly cover its case as made out. We deem it unnecessary to discuss those which would put upon defendant the burden of proof of lack of negligence with respect to the property held by defendant under lease. We can not see that under the facts shown in this case they would in any wise affect the result. The instructions given on behalf of defendant inconsistent with the principles herein stated should on a new trial be rejected.

Plaintiff complains of the rejection of certain evidence. We think the map or plat offered to show the lay-out of the buildings should have gone to the jury for that purpose. It may not be complete, but would be of considerable benefit. Of course, it is not evidence, in the proper sense of the term, but witnesses should be permitted to use it while testifying to show the relative situations of the different parts of the building, and persons concerned. Nor do we understand why Chas. W. Siever should not be permitted to state that he did not know the dangerous condition of the kiln until after the fire occurred, a fact alleged in the declaration; this may be immaterial, but we think plaintiff should have been permitted to prove it.

Many other errors have been assigned, but we have undertaken to discuss only those which need arise on a new trial. For the foregoing reasons, the judgment will be reversed, the verdict set aside, and a new trial awarded.

*Reversed and remanded.*